# 3. ORAL SWORN STATEMENT OF TIMOTHY BERNARD EDWARDS

ORAL SWORN STATEMENT

OF

TIMOTHY BERNARD EDWARDS

TAKEN BY:

MR. TODD DERRICK, Attorney at Law

Cobb, Shealy, Crum & Derrick, P.A.

206 North Lena Street

Post Office Box 6346

Dothan, Alabama 36302-6346.

COURT REPORTER:

MS. TINA HARRISON

ORIGINAL

TIMOTHY BERNARD EDWARDS,

being first duly sworn to tell the truth testified as follows:

EXAMINATION

BY MR. DERRICK:

Q. She's going to be typing down what we say. You may have done something like that before, but remember, you've got to speak out loud so she can type it. Could you tell me your name?

A. Timothy Bernard Edwards.

Q. Okay. And is it Edwards with an "s" on the end?

A. Uh-huh.

Q. And you're a plaintiff in a civil lawsuit in federal court. You've sued a police officer and sued the County; right?

A. Yes, sir.

Q. And you understand that I only represent Officer Holmes -- Brett Holmes? You understand that; right?

A. Yes, sir.

Q. Okay. I just want to ask you few a questions about the day you got arrested.

A. Okay.

Q. You were arrested March 22nd, 2006; is that right?

A. Yes, sir.

Q. And as I understand it, you don't claim that that was your house. You were just visiting there; right?

A. Yes, sir.

Q. And when you saw the police arrive, you decided to try to run; right?

A. Yes, sir.

Q. And you ran toward the back of the house?

A. Yes, sir.

Q. But you couldn't figure out how to get out of the house?

A. Yes, sir.

Q. And so what you decided to do then was hide under the bed?

A. Yes, sir.

Q. In a room in the back of the house?

A. Yes, sir.

Q. You were face down under the bed?

A. Under the bed.

Q. And you weren't particularly familiar with what was in that room?

A. No, sir.

Q. Is that correct?

A. Yes, sir.

Q. Okay. Now, at some point, apparently, some people outside told the officers that you were in there?

A. Yes, sir.

Q. Because you had seen them in the room before. They didn't know you were under the bed; right?

A. Yes, sir.

Q. And then they came back and they got you?

A. Yes, sir.

Q. Now, I think the phrase you said is you knew the drill. So you already had one arm behind your back, and your face was on the floor?

A. Uh-huh.

Q. And you remember your arm being grabbed by one of the officers?

A. Uh-huh.

Q. Right?

A. Yes, sir.

Q. You don't know who that officer was that grabbed your arm; correct?

A. No, sir.

Q. Is that correct?

A. Yes, sir.

Q. You remember being hit in the back and then going back down on the floor again?

A. Yes, sir. They grabbed my arm and twisted it and went to raise me up. When they were raising me up, somebody stepped in my back and pushed me back down to the floor.

Q. And you're not claiming that Brett Holmes did that --

A. No, sir.

Q. -- right? Is that right?

A. Yes, sir.

Q. And then you remember being struck in the face -- on the side of the face. You think

it was with someone's foot or boot; right?

A. Yes, sir. I seen their foot.

Q. You saw the foot? And, again, you're not saying that that was Brett Holmes that did that; correct?

A. Yes, sir.

Q. Okay. And then you recall being drug away from where you were under the bed; right?

A. Yes, sir. A little further than that. I came out from -- they drug me from under the bed -- when they drug me out from under the bed -- at that time -- that's when they put the other handcuff on me, and they got ready to pick me up. And then one of the officers, like I said, said, No. Don't pick him up. Drag him. So they drug me to outside of that room.

Q. Okay. And that's what -- just so I'm clear, then they drug you out of the room you were in?

A. Uh-huh.

Q. And I'm going to ask you a few more questions about that day, but that covers the use of force that any of these officers used against

you in making that arrest. Am I right?

A. Yes, sir.

Q. Now, a few more things, just for the record. And I'm not asking you to admit that it was your drugs, but you don't deny that there were drugs in the house?

A. Like I said, I don't know what to say about it, for the simple fact that I don't know no more than what they told me. When I got there --

Q. And that's what I'm saying. You don't deny that. If someone else said there were drugs in the house, you wouldn't argue with them; right? Is that correct?

A. Yes.

Q. Okay. And there were guns in the house? And I'm not saying that they were your guns, but you don't deny that there were guns in the house?

A. I said from what the police -- I couldn't figure out no reason -- no other reason why, other than they told me they found this and they found that. And I just --

Q. Right. And so you wouldn't argue with anyone who said there were guns in the house; right? Is that correct?

A. I couldn't argue -- like I said, they supposedly have pictures of this and all this. Like I said, they brought it to the preliminary and showed me.

Q. Sure. And we were talking about the fact that there were three guns -- you and I -- before we went on the record. You remembered two of them -- the type of guns -- and what were they?

A. They mentioned it, and that's how I found out what they was. Like I said, the guy said it was a 9-millimeter -- well, I read it in my paperwork -- a 9-millimeter and a .357.

Q. And a .22?

A. And a .22. So that's what made me go -- when they called me across the street and asked me about it, that's what made me come back and ask this guy that said something about the guns. That's what made me -- because they told me if I don't find out whose it was, that I would

be charged. So I came back and I asked him. And I went right back across there and told them, and that's why they -- that's why they took it from there.

Q. And the .22 -- you think it was the .22 that somebody remembers seeing in the same room with you? Am I right?

A. No. How I know about the .22 was in the room -- they told me through my paperwork -- they said something about there was a .22 -- or either when we were at the preliminary or something. Mr. Holmes was on the stand, and they asked about the weapons. And he said that there was a weapon in the room that I was in. And that's how I found out there was one in there.

Q. Okay. And that's my point. And, again, I'm not asking you to admit that it was your gun. I'm just pointing out that you don't dispute if someone else said they saw a gun in this room -- because you really weren't familiar with that room --

A. Yes, sir.

Q. Right?

A. Yes, sir.

Q. And so you're not arguing with anyone who says there was a gun in the room; is that correct?

A. Like I said, I can't because, like I said, I don't really -- I didn't know what -- I didn't look around. I was trying to find an exit.

Q. Right. You weren't looking around the room. You were just trying to hide when you were under the bed; right?

A. Yes, sir.

Q. And so if somebody else said they saw a gun in the room, you wouldn't be able to argue with them; is that right?

A. I couldn't argue -- like I said, I couldn't argue because I didn't -- I didn't -- I haven't been in there like that so --

Q. Sure.

A. -- I have no idea.

Q. All right. Now, when you -- I showed you a form before we started, and I want to just show it to you one more time. And this is

already a part of the Court's record that the other defendants put in. Remember, we looked at the medical screening form. It's dated --

A. I read two of them. One of them was from when I first came back in --

Q. This is the one from the day you were arrested, that we're talking about; right -- March 22nd --

A. Uh-huh.

Q. -- 2006? That's the day you were arrested --

A. Uh-huh.

Q. -- right? And that's the medical screening form that we were talking about; right? (Indicating)

A. Uh-huh.

Q. And that's your signature there at the bottom? (Indicating)

A. Uh-huh.

Q. Okay. And it says on this form that you were conscious; right?

A. Uh-huh.

Q. And it asks, Did you have any

difficulty breathing, and no is circled; right?

A. Uh-huh.

Q. Did arrest result in injury? And no is circled; right?

A. What is it?

Q. Right there it says, Did arrest result in injury, and the "n" is circled; correct?

A. See, they filled all this out. They gave me this. It was this sheet. (Indicating)

Q. That's not my question. And I want to just go through this and make sure -- I'm talking about the medical screening form, okay? And we've gone through it. I just want to go over the list of things here, and you tell me if I'm reading it right. Where it says, Inmate was conscious, yes is circled; correct?

A. Uh-huh.

Q. Where it says, Any difficulty breathing, no is circled; correct?

A. Uh-huh.

Q. Where it says, Did arrest result in injury, no is circled; correct?

A. Uh-huh.

Q. When it says, Is inmate under obvious influence of alcohol, no is circled?

A. Uh-huh.

Q. Does inmate suggest the risk of suicide? No is circled?

A. Uh-huh.

Q. And you need to say yes.

A. Yes.

Q. When we go back and read "uh-huh," it doesn't read that well.

A. Yes.

Q. Where it says, Inmate capable of responding, the answer is yes?

A. Yes, sir.

Q. Is inmate hostile or aggressive? The answer is no?

A. Yes, sir.

Q. It asks about any fever, swollen lymph nodes, or jaundice. The answer is no; correct?

A. Yes, sir.

Q. Is inmate under obvious influence of drugs? The answer is no?

A. Yes, sir.

Q. Did you consider inmate an escape risk? The answer is no; correct?

A. Yes, sir.

Q. It says, Can inmate walk on own. The answer is yes?

A. Yes, sir.

Q. Any visible signs of trauma, bleeding, wounds, or illness? The answer is no; correct?

A. Yes, sir.

Q. Is skin in good condition and free of vermin? The answer is yes?

A. Yes, sir.

Q. Your skin was clean. Any visible signs of alcohol or drug withdrawal? The answer is no; correct?

A. Yes.

Q. And then here, under observation, it says, Subject seems to be fine at time of intake. I read that correctly, didn't I?

A. Yes, sir.

Q. And, again, that is your signature? (Indicating)

A. Yes, sir.

Q. The other document we talked about before is what you've called a motion to amend. That was filed back in May. And just so I'm clear, your allegation is not that Officer Holmes hit you in the face or kicked you in the face or hit you in the back. Your only allegation about Officer Holmes is that he drug you across the floor. Am I right?

A. My only allegations against him, period, is that I found him out to be one of the officers -- you know what I'm saying -- when all of this went down.

Q. I understand. And I don't think anybody is denying it. Your allegation against Officer Holmes is that he was one of the guys that drug you, because you heard him say that on the stand in some hearing. Am I right?

A. Yes, sir.

Q. You're not claiming that he did these other things that we talked about?

A. No, sir.

Q. Am I correct?

A. Yes, sir.

Q. All right. I think we're about through. I just want to look over my notes real quick. I think I asked this already. Again, I'm not asking you to say it was your drugs, but you're not denying that -- if anybody says they found drugs in the house, you're not going to argue about that?

A. Like I said, I couldn't say.

Q. Same thing with the guns.

A. Like I said, I couldn't say no more than what they told me -- in the police report or whatever it was.

Q. You understood all of my questions?

A. Yes, sir.

Q. Okay. Do you want to say anything else before we end?

A. No, sir.

Q. I just wanted to give you a chance to make any other statement, if you feel like you need to.

A. No, sir.

Q. All right. I appreciate it.

REPORTER CERTIFICATE

STATE OF ALABAMA )
COUNTY OF COFFEE )

I hereby certify that the above and foregoing sworn statement was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in any way interested in the result of said cause.

Certified this the 14th day of July, 2006.

Tina Harrison

TINA L. HARRISON
Court Reporter
(334) 793-3673